IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| MICHAEL AUBREY WALKER, | ) | Case No. 12-61614 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |
| JOSEPH R. WILSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adversary No. 12-6069 |
| | ) | |
| MICHAEL AUBREY WALKER, | ) | |
| TAMAR WALKER, and | ) | |
| PRECIUS PRINCESS | ) | |
| PRODUCTIONS, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Plaintiff Joseph R. Wilson seeks a determination that Debtor Michael Aubrey Walker owes him a debt and that such debt be nondischargeable under 11 U.S.C. § 523.  He also requests that the Court enforce any judgment jointly and severally against the Debtor's non-filing spouse, Tamar Walker, and her limited liability company, Precious Princess Productions, LLC (now Unchained Productions, LLC).  Wilson also seeks a denial of the Debtor's general discharge under 11 U.S.C. § 727.  The Debtor, in turn, asserts a counterclaim against Wilson. For the reasons that follow, judgment will be entered in favor of the Defendants on the Complaint and in favor of Wilson on the counterclaim.

## INTRODUCTION

The Debtor is a musical performer.  Wilson became his manager in 2002.
Three written management agreements were later signed between them.  The final
such agreement, signed in 2008, was to run for a period of 25 years, with Wilson
having the right to extend for an additional eight years beyond that.

The issues here are (1) whether the bankruptcy court has authority to enter
final judgment in this case; (2) whether the 2008 management agreement is
enforceable; (3) if enforceable, whether either the Debtor or Wilson failed to pay
the other monies owed under such agreement and, if so, how much; (4) if monies
are owed by the Debtor to Wilson, whether such debt is nondischargeable in the
Debtor's bankruptcy case; and (5) whether the Debtor's general discharge should
be denied.  I hold that the management agreement between Wilson and the Debtor
is void as being unconscionable, so that there is no debt owed by either to the
other.  I further hold that the Debtor is entitled to a discharge.

## FACTUAL BACKGROUND

Wilson's working career began in his parents' international wallpaper
business.  He eventually developed his own construction business, known as JW
Enterprises, in the Washington, D.C. area.  While doing so, Wilson also wrote
songs and, from 1993 on, spent part of his time in Nashville, Tennessee.  He later
sold JW Enterprises to his partner, a Mr.  Bhalala, who changed the company's
name to JW Ram Enterprises, LLC.  After the sale, Wilson testified, his connection
to JW Ram was "complicated," but in any event, he held an ongoing right to at
least 50% of JW Ram's profit.  More recently, Wilson repurchased the company
and is operating it.

Wilson and the Debtor met in Nashville in 2002. At the time they met, Wilson was approximately 45 years old, and the Debtor was 26. By all accounts, the Debtor is a very talented singer, particularly as an impressionist. Prior to 2002, the Debtor had been trying to make a living as a karaoke singer, and later doing impressions of Elvis Presley, Conway Twitty, and others. He had recently cut an album with Dreamworks, and was being promoted by Dale Morris, who Wilson described as being the strongest, most productive manager in Nashville. Ultimately, Dreamworks folded and the Dreamworks album did not produce much for the Debtor. He and Morris parted ways.

Prior to meeting the Debtor, Wilson testified, he had managed "a couple" of acts in the Washington, D.C. area. This was while he was also involved in the construction business.

In any event, the two men became good friends, and in late 2003 or early 2004, Wilson verbally agreed to help manage the Debtor's career. This was not a full-time job for Wilson at the time, as he still had the business interests in the D.C. area. The Debtor had no money to make promotional records or videos, and Wilson agreed to provide advice, counsel, and some funds to help him get started. According to Wilson, at that point, they thought they would just record some songs and see what happened.

Prior to 2005, while operating under this informal arrangement, they got a few bookings, but made no money after payment of expenses. In April 2005, Wilson retained an attorney who drafted an Artist Management Agreement ("the 2005 AMA"), which was signed by both Wilson and the Debtor.[1] Under the 2005

---

[1] Exhibit 7.

AMA and all later AMAs (discussed below), Wilson was obligated to advise and counsel the Debtor in all matters concerning development of his act, publicizing himself, selection of venues, and terms of contracts. However, Wilson had little applicable experience in this area, inasmuch as his prior experience with contract terms was primarily in the construction business, other than the limited music management work he had done in the D.C. area.

As most relevant, the 2005 AMA provided for a three year term, and gave Wilson the right to renew for up to four additional one-year terms, or a total potential term of seven years.[2] Wilson's compensation was to be 15% of "gross compensation" from the Debtor's performances and publishing, but 25% from any voice impression work the Debtor did.[3] Wilson testified that the difference in the percentages was intended to recognize that it takes longer to build a career as an impressionist than it does for other singers. The 2005 AMA further provided that, in the event an individual or corporation wished to buy out the right to manage the Debtor's affairs, Wilson would be entitled to $2 million to withdraw.[4] Wilson testified in general that the purpose of this provision was to prevent more powerful people from coming in and taking away the benefit of his work in developing the Debtor's talent. Finally, as relevant here, the 2005 AMA provided that, in the event that Wilson was not personally able to render services under the agreement, then the Debtor had the option to terminate the agreement upon thirty days written notice to Wilson.[5]

---

[2] *Id.* at ¶ 10.

[3] *Id.* at ¶ 5.

[4] *Id.* at ¶ 14.

[5] *Id.* at ¶ 16.

While the Debtor contends their arrangement was intended to be a partnership, the evidence demonstrates that this was instead a sole proprietorship, with Wilson being, in effect, the employer and the Debtor the employee.  Wilson acted as the Debtor's manager as a sole proprietorship in the name of W&W Enterprises, a fictitious name he registered with the Missouri Secretary of State. The Debtor does not challenge the enforceability of the 2005AMA, which in any event has expired by its terms.

After the 2005 AMA was entered into, Wilson spent funds on demo records and video tapes of the Debtor performing, a photo shoot, and trips to Las Vegas and Atlantic City to view other impressionists.  Wilson contends that between 2005 and 2008, he invested in excess of $100,000 in promoting the Debtor's career, but did not adequately document such expenses, and did not prove what proceeds, if any, he received from the Debtor's performances.

On July 1, 2006, Wilson signed, on behalf of the Debtor, an Exclusive Booking Agreement with Al Embry International, LLC.  This agreement had a term of two years, with a two year extension option.

On April 1, 2007, in the name of W&W Enterprises, Wilson entered into a 5-year Performance Agreement for the Debtor to perform at the Mickey Gilley Theater in Branson.[6]  This contract was the result of Mickey Gilley's having seen the Debtor perform at the Legends Bar in Nashville.  According to the Debtor, it was Al Embry who connected them with Gilley.

Soon after entering into the Performance Agreement with the Gilley Theater, on April 30, 2007, Wilson and the Debtor entered into a new Artist Management

---

[6]  Exhibit 9.  The parties testified that the initial contract with the Gilley Theater was one year, but that the contract was extended to five years.

Agreement ("the 2007 AMA") to replace the 2005 AMA.[7]  Unlike the 2005 AMA, Wilson prepared the 2007 AMA without the advice of an attorney.  Wilson, who testified he had one year of college education, said he used the 2005 AMA as a template for the 2007 AMA.  However, he radically changed several provisions to make them much more favorable to himself.  It is this 2007 AMA, as well as another signed in 2008, which the Debtor challenges here.

Specifically, the 2007 AMA extended the term to twenty years with four two-year options, which, as before, were exercisable only by Wilson.[8]  Notably, Wilson had the Debtor initial this particular paragraph in the 2007 AMA.  In addition, the 2007 AMA increased Wilson's percentage to 25% on all receipts.[9]  It further raised the buyout option for another organization or individual to acquire the rights to the Debtor to $10 million.[10]  Finally, although the 2007 AMA now permitted the Debtor to "purchase" from Wilson, for the price of $8 million, any remaining period from the twenty-year agreement, it expressly eliminated any right the Debtor previously had to terminate Wilson.[11]  Further, the 2007 AMA removed a provision allowing the Debtor to terminate on thirty days' notice if Wilson were unable to perform; rather, under the 2007 AMA, if Wilson were unable to render the services described in the agreement, Wilson had the right to secure

---

[7] Exhibit 10.

[8] *Id.* at ¶ 10.

[9] *Id.* at ¶ 5.

[10] *Id.* at ¶ 14.

[11] *Id.* at ¶ 10 ("It is understood by ARTIST that MANAGER cannot be replaced or fired for any reason or circumstances during this twenty (20) years [sic] Agreement, exception [sic] specified in paragraph (12).  However ARTIST may at any time during this Agreement pay MANAGER the sum of EIGHT MILLION DOLLARS ([$]8,000,000.00) to purchase any remaining period from twenty year [sic] Agreement.").  Paragraph 12 of the AMAs provided for a cure period for any claimed breach and, in the event of no such cure, required that the parties submit to arbitration in the State of Virginia.

"temporary" replacement management for the remaining period under the agreement.[12]  Both the 2005 and 2007 AMAs provided that the Debtor would only work at such times and places as were approved by Wilson in writing.[13]

At the Gilley Theater, performers are given a time slot, with the theater taking a specified amount per ticket sold, and the rest going to the performer. Under this arrangement, the performer is responsible for expenses such as a backup band and lighting.  Wilson testified that, even though the 2007 AMA provided that the Debtor was responsible for payment of expenses, both parties knew that as a practical matter, Wilson was so responsible.  Wilson paid those expenses incurred in 2007 in large part with funds he borrowed from his construction business partner, as well as funds that the Debtor was able to borrow from a family friend in Tennessee.  Wilson also testified that the Debtor was paid a salary by W&W, and was issued Form 1099's by W&W.

While Gilley had predicted that W&W would not make money the first year, particularly since the Debtor was working in a 5:00 p.m. time slot, the Debtor's show was a hit, and they at least broke even and repaid all loans.  W&W's revenues for the Debtor's 2007 performances totaled $154,549, from which all loans and expenses were repaid.  Thus, Wilson had no unrecovered investment for the 2007 year.

The season in Branson ended in December 2007 and was set to resume in about March of 2008.  During that off-season period, the Debtor married Defendant Tamar Walker, also a performer in Branson.

---

[12]  *Id.* at ¶ 16.

[13]  Exhibit 7 at ¶ 3.b; Exhibit 10 at ¶ 3.B.

7

In January 2008, Wilson was contacted by one Eddie Rhines, a booking agent, about moving the Debtor's show to a new venue to be created in Pigeon Forge, Tennessee. Rhines had seen the Debtor perform, and was impressed. The venue, known as The Father's House, was a former church which was to be renovated to seat approximately 1200 people. The purchase and renovation, Rhines said, was to be paid for by a Bob Deason, in partnership with Sherri Bowman. Rhines was to play an unspecified role in that partnership. The financial terms offered by Rhines were much more favorable to the parties than had been the case at the Gilley Theater, with compensation for the Debtor's performances being $7,500 per week from April to December 2008, plus a percentage if more than 2,500 tickets were sold in a given week.[14] Apparently unbeknownst to Deason, Wilson agreed to kick back a portion of monies received by W&W to Rhines. In any event, the total package was to be in the range of $275,000 per year to W&W for two years. In addition, Rhines agreed that Deason would pay Wilson and the Debtor's living expenses, and the cost of a backup band. Wilson and the Debtor were both enthusiastic about the possibility. And, the Debtor testified, Wilson had told him they needed to get out of Branson because no one liked Wilson there.

On March 21, 2008, Wilson signed a Letter of Intent with an entity created by Deason, Smoky Mountain Entertainment, LLC ("SMEC"), to move the act to Pigeon Forge.[15] This move necessarily required W&W Enterprises to break the five-year contract with the Gilley Theater in Branson at the end of April 2008, which was after performances had resumed there. Understandably, Gilley was not happy with that decision, although he testified he agreed to let the Debtor pursue

---

[14] *See* Exhibit 11.

[15] *Id.*

8

the Pigeon Forge deal.[16]   While Wilson contends that he and the Debtor acted jointly in deciding to go to Pigeon Forge and break the contract with Gilley, it was Wilson's responsibility to advise the Debtor on such matters.  And, under the 2007 AMA, the Debtor could not perform anywhere else without Wilson's approval.

Wilson did almost no meaningful due diligence on the viability of the Tennessee operation.  Nevertheless, based on the Letter of Intent, which was contingent on SMEC closing on the purchase of the intended church property venue, Wilson and the Debtor moved to Pigeon Forge on or about May 1, 2008, and soon began rehearsals, thereby incurring expenses for lodging and band costs. Under the deal Wilson had made with Deason, those expenses were to be paid by SMEC.

On May 20, 2008, SMEC, W&W Enterprises, and the Debtor entered into an Artist Performance Agreement,[17] which referred to W&W Enterprises and the Debtor collectively as the "Artist."  The performances under the contract were to take place in the former church property that SMEC was to acquire and renovate. The contract also provided that, upon acquisition of the church property, SMEC would deposit $245,000 in an escrow account, to be drawn on to make payments due W&W during the first year of the contract.[18]  But the contract also provided that the escrow account would be controlled by SMEC,[19] meaning that it provided no real security to Wilson or the Debtor at all.  In any event, SMEC never acquired the church property, and never deposited the $245,000 into escrow.

---

[16] *See also* Exhibits 13 and 14.

[17] Exhibit 15.

[18] *Id.* at ¶ 2.d.

[19] *Id.*

9

Out of money and unable to pay the Debtor's and his own living expenses, Wilson then signed an amendment to the Artist Performance Agreement with SMEC providing that performances could be in either the church venue or in other leased property.[20] So instead of the 1200-seat church property, the show ended up in a smaller 200-seat venue, which obviously affected the financial viability of the operation.   SMEC was obligated to make bi-weekly payments to Wilson of $15,000 once rehearsals began on May 13, 2008, and to pay Wilson and the Debtor's living expenses.[21] SMEC failed to timely make the bi-weekly payments, failed to timely pay all living expenses incurred, and failed to reimburse the parties for all the band and lodging expenses they incurred.

The move to Pigeon Forge was ill-conceived because Wilson did not do sufficient research on the financial viability of the project or its backer, Deason. And, again without the advice of counsel, he entered into an agreement that was, in effect, unenforceable, particularly since he had the Debtor begin work without requiring that the funds to pay W&W be placed in a secure escrow account.  And, as will be seen, associating himself and the Debtor with the people connected to SMEC was itself a poor decision:  In sum, as discussed more fully below, the Pigeon Forge deal ended with multiple lawsuits, a taped conversation of a threat of bodily harm, extortion, and negative publicity.   Suffice it to say that the consequence of these poor management decisions has had devastating effects on the Debtor's career.

Meanwhile, during the period in which Wilson was advising the Debtor to move to Pigeon Forge under the new arrangement, and to break the contract with

---

[20] Defendants' Exhibit G at ¶ 1.

[21] *Id.* at ¶ 2.b and g.

Gilley, Wilson himself filed a Chapter 7 bankruptcy case in Nashville, on March 6, 2008, listing various business and personal debts.[22]  None of the debts listed relate to W&W Enterprises, or to expenses related to the Debtor's performance at the Gilley Theater or elsewhere.  The list of assets he filed in his bankruptcy case indicated that he had a management agreement in the name of W&W Enterprises, but did not state that he was owed any monies under that agreement, by the Debtor or anyone else.  Given Wilson's position that the Debtor was in effect his employee, and that he was the sole owner of W&W, that position would be correct.[23]

In any event, Wilson's bankruptcy schedules contain a number of omissions. Most pertinently, Wilson failed to list his ongoing profit interest in JW Ram Enterprises.  In 2007, the year prior to his bankruptcy filing, he had been paid $15,870 by JW Ram.[24]  That ongoing interest would have been an asset of his estate available to pay his creditors.  Instead, he listed assets of just $5,012 in value, including 40 published songs of no value.  He also failed to list any executory contracts, though at the time W&W Enterprises had four years left with the Gilley Theater.  He listed debts totaling $97,501.56.

During the same period as his own bankruptcy, and about the time they moved to Pigeon Forge to begin rehearsals, Wilson prepared a new Artist

---

[22]  Defendants' Exhibits Z and AA.

[23]  Because Wilson's claim against the Debtor here might have been an asset in Wilson's own bankruptcy case, on February 14, 2014, upon learning of Wilson's bankruptcy, this Court ordered Wilson's counsel to notify the United States Trustee and the Chapter 7 Trustee in Wilson's case of this adversary proceeding and his right to intervene in it, if the Trustee concluded this case had any value to Wilson's bankruptcy estate.  *Order Denying Joint Motion of Defendants to Add Additional Affirmative Defenses (Cancellation Based on Fraudulent or Unfair Concealment and Lack of Standing)* (Doc. No. 133).  The Trustee has not intervened.

[24] Exhibit 101.

Management Agreement ("the 2008 AMA").[25]    Once again, Wilson took the original 2005 AMA and modified it to his advantage, and once again, he did not seek the advice of counsel in doing so.    Wilson testified that the changes made in the 2008 AMA were made at the Debtor's request, but, given the changes made, discussed below, I find that assertion to be lacking in credibility.

The 2008 AMA, which was signed on April 28, 2008, extended the term to 25 years from signing, with Wilson having the right to exercise options for up to an additional eight years.[26]    Wilson's compensation was increased from 25 to 50% of gross revenues received by W&W.[27]    The provision stating that Wilson could not be replaced or fired for any reason – which had been added into the 2007 AMA – remained, but the provision allowing the Debtor to buy out Wilson's contract was removed.[28]    Finally, this new version retained Wilson's sole right to secure replacement management for the remaining period of the agreement if he were to become unavailable to render services, but added a provision stating that, in the event that Wilson died during the term of the agreement, the Debtor was required to permit Wilson's "benefactor" to select a replacement manager "acceptable" to the Debtor for the remaining term.[29]    Although not entirely clear, this amendment also appears to require the Debtor to pay the "benefactor" at the same rate of

---

[25] Exhibit 12.

[26] *Id.* at ¶ 10.  The 2008 AMA actually states that the term was "for a period of time twenty years (25) commencing from the date of the execution of this Agreement."  It was pointed out at trial that this is internally inconsistent.  Wilson testified at one point that the "25" was a typographical error, and that the term under the 2008 AMA actually remained at twenty years.  In any event, as discussed below, I find that, even if the term remained at twenty years with eight years of options, that term was also unreasonable.

[27] *Id.* at ¶ 5.

[28] *Id.* at ¶ 10.

[29] *Id.* at ¶ 16.

compensation Wilson was to be paid under the agreement, regardless of whether the benefactor procured an acceptable replacement.   And, if the benefactor had agreed to pay a replacement manager at a lesser rate, the benefactor was to receive the difference.[30]

Wilson contends that one of the aspects of consideration for this further extension was that he gave up his right to collect from the Debtor the more than $100,000 he had invested in the Debtor's career since 2003.[31]   As stated, however, there was scant documentation for expenses in that amount.   Further, this argument presumes that the Debtor, in effect, borrowed monies from Wilson.   But, as Wilson also argues, W&W Enterprises was a sole proprietorship, with Wilson as its owner and the Debtor, in effect, as his employee.   Any monies which Wilson may have advanced, and did not receive back, were an investment in his sole proprietorship, not a loan to the Debtor.   In addition, even if Wilson had some right to collect funds from the Debtor, that right would have been an asset of Wilson's bankruptcy estate available for payment to his creditors.   In his bankruptcy case, which had been filed less than two months prior to the signing of the 2008 AMA, Wilson listed no debt due from the Debtor to him.

In any event, while the contract that Wilson signed with SMEC purported to guarantee income to W&W Enterprises of $7,500 per week from April to

---

[30]  *Id.* ("In the event MANAGER pass's [sic] away, ARTIST will allow MANAGER'S benefactor the right to hire at benefactor['] cost, a replacement MANAGER (ACCEPTABLE TO ARTIST) for the remainder period of contract with no options.  Payments will be paid at same existing rate to benefactor and will be paid monthly by ARTIST or new MANAGER less MANAGER[']S prior arranged fee from benefactor with a detailed account of monthly receipts.").

[31]  *See id.* at ¶ 1.I.

13

December 2008, and for the same months in 2009, SMEC terminated it effective July 18, 2008, after less than a month's worth of performances.

The parties disagree as to why the contract with SMEC was terminated. Attendance in the smaller venue had been low after opening night.  Wilson contends that the sole reason the contract was terminated was that the Debtor had met with Deason and other representatives of SMEC, and outlined a series of suggestions as to how they might improve attendance, based on the Debtor's experience in Branson.  The Debtor testified that he did meet with the SMEC representatives out of frustration, both that attendance was low, and that Wilson was not requiring SMEC to timely make payments due or to put the required funds in escrow for payment of the sums owed to them for the balance of the year.  And, the Debtor testified, Deason and Bowman had never operated a theater before, and he simply shared with them the ways his act had been successfully publicized in Branson.

However, that meeting is not the reason that SMEC representatives gave immediately after the termination; instead, their attorney was quoted in the local newspaper blaming Wilson for the termination.  Specifically, the newspaper quoted SMEC's attorney saying that Wilson "was very difficult to get along with, effectively trying to run my clients' theater, and became so difficult to get along with that, rather than keep an excellent performer [that being the Debtor], we felt we had to terminate him because of the relationship with the manager."[32]  As discussed more fully below, Wilson later sued Deason and Bowman, in part based on defamation over this comment, and that litigation ended with Wilson giving Deason an extortion tape involving Eddie Rhines in exchange for money, a guitar

---

[32] Exhibit 57.

collection, and a retraction of the newspaper comment faulting Wilson for the termination.

After the termination of his show by SMEC, Rhines, who by that time had also split with Deason and Bowman over the collapse of the show in Tennessee, and who was involved in separate litigation with them, arranged for Wilson and the Debtor to meet with the well-known producer, Don King, in Florida.

There, after a series of meetings over two days, Wilson and the Debtor signed an "Entertainment Personal Management Agreement" with Don King Productions.[33]  The agreement had a term of three years, with one three-year extension period, unless either party notified the other that they did not want to extend.[34]  Under this agreement, the Debtor engaged King Productions as his "Career Business Manager," with Wilson being a party to the contract as the Debtor's "Personal Business Manager."  King was to act as the Debtor's "sole and exclusive Career Business Manager and general business advisor, and . . . to supervise, guide, and direct [the Debtor's] professional career as an entertainer, individually, and to attend to and assist in all business arrangements in connection with [the Debtor's] career in entertainment."[35]  King was to be paid 50% of revenues.[36]  Of course, Wilson still claimed that he was entitled to 50% of what was left for the Debtor.  In the end, no work for the Debtor came out of that arrangement, and King has made no claim for entitlement to any revenues earned by the Debtor over that three-year period.

---

[33] Exhibit 16.

[34] *Id.* at ¶ 3.

[35] *Id.* at ¶ 1.a.

[36] *Id.* at ¶ 4.

15

Once again, Wilson and the Debtor disagree as to the reasons no work came out of the King contact. Wilson claims the problem was that the Debtor refused to go with King to the 2008 Olympics in China immediately after the meetings in Florida, although he also testified that King had said he was going to the Olympics, and would work on getting the Debtor a show in Las Vegas or elsewhere upon his return. Regardless, a more plausible explanation is that, as the Debtor testified, Wilson insisted on being an actual party to the contract between the Debtor and King, which King did not want. Also, being short of money, Wilson at least twice contacted King's representative after the contract was signed (and while King was in China) asking for advances – as much as $100,000 – against monies to be earned under the contract.[37] After the second such request, Wilson and the Debtor never heard from King again. I find that, while the original contact with King came about at least in part because of Wilson's relationship with Rhines, it was Wilson's management style that prevented the Debtor from using that contact to further his career. And it was the Debtor's talent, not Wilson's, which created opportunities such as that one in the first place.

In any event, with no source of income following the termination of the Pigeon Forge deal, the Debtor and his wife had gone first to live with his parents for a while, and then to live with her parents for several weeks. Around the time it became apparent that nothing was to come of the King deal, and feeling as though he had overstayed his welcome with his wife's parents, the Debtor went back to Branson to find work. When Wilson became aware of that, he threatened Mickey

---

[37] *See, e.g.,* Exhibit 113 (e-mails between Wilson and Don King's representative, Jimmy Adams, concerning Wilson's demand for a loan against future income).

Gilley with a lawsuit if Gilley engaged the Debtor directly, without paying Wilson 50% of any amounts earned by the Debtor.[38]

On September 15, 2008, the Debtor sent Wilson an email giving notice that he was terminating Wilson as his manager.[39]  In the email, he said that an artist's manager is a reflection of the character of the artist.  He said:  "In the trail that we have left behind thus far since we have been together, we can't go back to anyone that we have had business with . . . because of the way that you have handled the business side of things.  There is no way I will enter into an agreement with anyone or any deal in the future without first consulting a lawyer."[40]  He also stated that "the tension in Branson was so high because of your conversations with Mickey Gilley concerning the sewing [suing] of Ozark Entertainment [Gilley's company] and telling everyone that you tape your conversations."[41]  The letter also states that Wilson had failed to find work for the Debtor and, while he could get work right away with Mickey Gilley and others in Branson, his avenues to do so were blocked because the owners of those venues refused to work with Wilson.

Indeed, by letter dated September 26, 2008, Mickey Gilley notified the Debtor that he could not engage him for performances at his theater, "[d]ue to past experiences with your manager, Joe Wilson. . . ."[42]  That same day, an attorney hired by the Debtor notified Wilson in writing that the Debtor was terminating the 2008 AMA.[43]  In response, Wilson's attorney took the position that the 2008 AMA

---

[38] *See, e.g.*, Exhibit 42; Defendants' Exhibit K.

[39] Exhibit 18.

[40] *Id.* at 1.

[41] *Id.*

[42] Exhibit 21.

[43] Exhibit 20.

could not be terminated and that any alleged claim of breach had to be brought in an arbitration proceeding in Virginia.[44]

From the fall of 2008 to August 2009, the Debtor worked mostly for tips singing in an open area at the Branson Mall.  In August 2009, the Debtor was booked to perform at the God & Country Theatre, where he has performed off and on since.[45]  He also received small amounts as "love offerings" for church singing, and for a small number of single performances.

Wilson claims that all such performances are subject to his 50% cut under the 2008 AMA.  Toward that end, Wilson has contacted a number of venues at which the Debtor has performed since 2009, and threatened litigation if they did business with the Debtor without including Wilson.  By way of example, the owner of the God & Country Theater, Richard Lee Easton, testified that Wilson contacted him to advise him that the Debtor was under a management contract with Wilson. He further testified that Wilson said he was planning to sue the owner of the Branson Mall, and would sue him as well.  Mr. Easton testified that Wilson's threat did not deter him from dealing with Walker through the company the Debtor's wife had just created, Precious Princess Productions, discussed below.  Similarly, the Debtor testified that, in the middle of a booking for a series of performances with D&D Entertainment at a resort in Cancun, Mexico, in 2012, Wilson contacted D&D in this manner and, as a result, the Debtor testified he was put on a plane home and the booking terminated.[46]  Indeed, there was testimony at trial that Wilson did, in fact, sue D&D Entertainment over the Cancun deal in 2012.

---

[44] Exhibit 22.

[45] *See* Exhibit 28.

[46] *See also* Exhibit 47.

As mentioned, in August 2009, the Debtor's wife, Defendant Tamar Walker, set up a separate company, Defendant Precious Princess Productions, to manage the Debtor's performances, and to receive the funds from such performances.[47] Tamar Walker is herself a singer and performs with a group called Angels of Country Music.  Tamar also arranged performances for Angels of Country Music through Precious Princess.   In 2012, Tamar created a successor company to Precious   Princess,   Unchained   Productions   LLC.[48]      Through   Unchained Productions, Tamar continues to manage the Debtor and Angels of Country Music. Essentially the income for performances by both spouses is funneled through Unchained Productions, from which the expenses incurred in their performances, as well as the household living expenses, are paid.

On July 30, 2012, the Debtor filed this Chapter 7 bankruptcy case.   The Debtor seeks to reject the 2008 AMA as an executory contract, and Wilson objects. In addition, Wilson filed this adversary proceeding seeking a determination that the debt owed to him under the 2008 AMA is nondischargeable under § 523 and that the Debtor's discharge should be denied generally under § 727 of the Bankruptcy Code.  He also seeks recovery of the Debtor's income which was funneled through Precious Princess and Unchained Productions.  The Debtor asserts a counterclaim for funds and a guitar collection Wilson received in connection with Wilson's litigation with Deason and Bowman, discussed more fully in the discussion of the counterclaim below.

---

[47] *See* Exhibits 26 and 27.

[48] Exhibit 31.

19

## THIS COURT'S AUTHORITY TO ENTER JUDGMENT

Prior to dealing with those issues, I consider whether a bankruptcy judge – who serves pursuant to Article I of the United States Constitution – has the statutory and constitutional authority to enter final judgment here, or must instead submit proposed findings of fact and conclusions of law to an Article III district court judge.

By statute, matters connected to a particular bankruptcy case are either core or non-core proceedings. If core, the bankruptcy court may enter final judgment. If non-core, the bankruptcy court may only enter final judgment with the consent of the parties; otherwise, the court must submit proposed findings of fact and conclusions of law to the District Court, which is then authorized to enter final judgment.[49]

Core proceedings are those in which, pursuant to 28 U.S.C. § 157, the bankruptcy judges are empowered to enter final judgment. Section 157(b)(2)(C) defines core proceedings to include "counterclaims by the estate against persons filing claims against the estate."

In *Stern v. Marshall*,[50] the debtor's stepson had previously filed a claim against her bankruptcy estate for defamation. In response, the debtor filed a counterclaim based on tortious interference with debtor's expectancy of an inheritance. The Supreme Court held that the statutory grant of authority to bankruptcy judges to decide counterclaims was too broad, and must be limited to

---

[49] 28 U.S.C. §§ 1334, 157; *Order Regarding Reference of Bankruptcy Matters to United States Bankruptcy Judges*, United States District Court for the Western District of Missouri (*en banc*) (August 15, 1984) (referring all cases under Title 11 and all proceeding arising under Title 11 or arising in or related to cases under Title 11 to the bankruptcy judges of this district).

[50] ___ U.S. ____, 131 S. Ct. 2594, 180 L.Ed.2d 475 (2011).

those that need to be resolved in order to rule on the proof of claim itself.  Since the debtor's counterclaim was "a state law action independent of the federal bankruptcy law and not necessarily resolvable by a ruling on the creditor's proof of claim,"[51] the Supreme Court held that the bankruptcy court did not have constitutional authority to enter final judgment, the statute notwithstanding.  As the Court said, in ruling on the counterclaim, the bankruptcy court exercised the judicial power of the United States under Article III of the Constitution "in one isolated respect,"[52] that being the ruling on the counterclaim.  Thus, the Court did not limit the bankruptcy court's authority to allow or disallow claims against the estate,[53] just counterclaims that need not be resolved in order to rule on such claims.

In sum, the *Stern* decision resulted in three types of causes of action in bankruptcy cases:  (i) core matters; (ii) non-core matters; and (iii) *Stern* matters – those that are statutorily core because they are listed in 28 U.S.C. § 157(b)(2), but are too broad to fit within the constitutional authority of non-Article III courts.[54]

In *Executive Benefits Insurance Agency v. Arkison*, the Supreme Court ruled that bankruptcy judges are constitutionally empowered to hold hearings on *Stern*-type causes of action, provided they make proposed findings of fact and conclusions of law to the District Court, which alone has the power to enter final judgment.[55] This procedure is identical to that used in non-core proceedings in

---

[51] *Stern v. Marshall*, 131 S. Ct. at 2611.

[52] *Id.* at 2620.

[53] 28 U.S.C. § 157(b)(2)(B).

[54] *See Executive Benefits Ins. Agency v. Arkison*, ___ U.S. ____, 134 S. Ct. 2165 (2014) (describing the three types of causes of action in bankruptcy cases).

[55] 134 S. Ct. 2165.

which the parties have not consented to final judgment by the bankruptcy court.[56] The Court did not rule on whether the bankruptcy court could enter final judgment in non-core and *Stern* matters without consent of the parties.

Wilson did not raise the issue until prompted to do so following the post-trial issuance of the Supreme Court's decision in *Arkison*, but Wilson now contends that, with the exception of his objection to the Debtor's general discharge, all other relief he requests is either non-core or a *Stern* proceeding. Although Rule 7008(a) requires that a complaint "shall contain a statement that the proceeding is core or non-core and, if non-core, that the pleader does or does not consent to entry of final orders or judgment by the bankruptcy judge,"[57] and Wilson did not so state in his Complaint, he now contends that he does not consent to final judgment being entered by the bankruptcy court.[58]

The threshold question on this issue is whether this is a constitutionally core proceeding.  If so, the bankruptcy court may enter final judgment regardless of consent.  If not, the next question is whether the bankruptcy court is empowered to enter final judgment with the consent of the parties.  I conclude that this proceeding is constitutionally core.  And, even if not, I conclude that all parties are deemed to have consented to entry of final judgment in the bankruptcy court, and that this Court has constitutional authority to enter final judgment with such consent.

---

[56] *See* 28 U.S.C. § 157(c)(1).

[57] Fed. R. Bankr. P. 7008(a).

[58] Doc. No. 148.

### *This is a Core Proceeding*

A bankruptcy discharge – which enables debtors to be relieved from certain obligations incurred pursuant to state or other federal law – is itself created by federal law.[59]   Exceptions to such discharge are also created by federal law.[60] Wilson claims here that any debt owed to him by the Debtor should be excepted from discharge pursuant to § 523(a)(2)(A), (4), and (6) of the Bankruptcy Code.[61] Any such debt would have been automatically discharged in the Debtor's bankruptcy case if Wilson had not filed an action such as this one and obtained a judgment of nondischargeability as to his claim, or a judgment denying the Debtor's discharge as to all debts.   An action for nondischargeability under the Code sections alleged by Wilson may be brought only in the bankruptcy court, not state court.[62]   Since the objection to discharge, and the objection to dischargeability of Wilson's debt, can only be brought in this court, it goes almost without saying that such objections are not "state law action[s] independent of the federal bankruptcy law."[63]   Therefore, the objection to discharge and to dischargeability are both statutorily and constitutionally core.

There are three additional issues to consider in determining whether this case is constitutionally core under *Stern*.  The first is that, in addition to a determination of dischargeability, Wilson, as the Plaintiff, seeks judgment for damages, and for

---

[59]  11 U.S.C. § 727.

[60]  11 U.S.C. §§ 523 and 727.

[61]  Generally speaking, § 523(a)(2)(A) excepts from discharge debts obtained by false pretenses, a false representation, or actual fraud; § 523(a)(4) excepts from discharge debts for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny; and § 523(a)(6) excepts from discharge debts for willful and malicious injury by the debtor.

[62]  11 U.S.C. § 523(c)(1).

[63]  *Stern v. Marshall*, 131 S. Ct. at 2611.

continued enforcement of the 2008 AMA.  The Debtor answers that, among other things, the contract upon which Wilson's suit is based is not enforceable.   Under *Stern*, the bankruptcy court has constitutional authority to decide the amount owed under the proof of claim filed by Wilson.[64]  And, in determining that amount, the bankruptcy court must necessarily determine whether the contract upon which that claim was based was enforceable.  Not surprisingly then, courts post-*Stern* have continued to hold that bankruptcy courts have authority to enter judgment for damages in connection with dischargeability determinations.[65]  Nothing in *Arkison* changed that conclusion.

The second issue concerns the counterclaim filed by the Debtor here,[66] in which he contends that Wilson breached 2008 AMA by, among other things, not sharing with the Debtor the funds (and guitars) Wilson received as a consequence of the deal in Pigeon Forge.  In *Stern*, the Supreme Court had stated that "[t]here was never reason to believe that the process of ruling on Pierce's proof of claim [which was constitutionally core] would necessarily result in the resolution of Vicki's counterclaim [which, the Court held, was not]."[67]

---

[64]  Claim No. 1-1, filed December 18, 2012.

[65] *Hart v. Southern Heritage Bank* (*In re Hart*), ___Fed. Appx.___, 2014 WL 1663029 at *2 (6th Cir. April 28, 2014) (holding that *Stern* did not strip the bankruptcy court of its constitutional authority to enter a final monetary judgment in a § 523(a)(2)(B) dischargeability action).  *See also CAI v. Shenzhen Smart-In Indus. Co., Ltd.*, ___ Fed. Appx. ____, 2014 WL 1647730 (9th. Cir. April 25, 2014) (holding that bankruptcy court had authority to liquidate debt which it found to be nondischargeable by entering money judgment in favor of plaintiff-creditors); *Cohen v. Third Coast Bank, SSB*, 2014 WL 2729608 at *7 (E.D. Tex. June 16, 2014) (holding that *Stern* did not change Fifth Circuit precedent holding that bankruptcy courts have the authority to enter a final money judgment when determining the dischargeability of creditors' claims in bankruptcy).

[66] Doc. No. 94.

[67] *Stern v. Marshall*, 131 S. Ct. at 2617-18.

The counterclaim here is different from the one filed by the debtor in *Stern*, since this one arises out of the very contract upon which the dischargeability action is based.  If that contract is found to be enforceable, this Court cannot make a complete determination of what is owed by the Debtor to Wilson without ruling on the counterclaim.  Therefore, the mere filing of that counterclaim does not convert the dischargeability action into a non-core or *Stern* proceeding.

The third issue is that, in addition to the Debtor, Wilson filed suit against the Debtor's wife, Tamar Walker, and against her company, Precious Princess Productions, LLC (now Unchained Productions).  As stated, after the rift developed between Plaintiff and the Debtor, Tamar Walker created Precious Princess, and on its behalf entered into performance agreements with venues at which the Debtor performed.  Tamar and the Debtor contend that, even if the management agreements are enforceable, revenues received by Precious Princess and Unchained Productions are not covered by them, and need not be shared with Wilson.  In his suit, Wilson asks that the Court, in effect, pierce the corporate veil, determine the amount of revenue received by Precious Princess and Unchained Productions that should have been shared with him, and enter judgment jointly and severally against the Debtor and the other Defendants for that amount.  Tamar and Precious Princess contend that if the agreements are not enforceable against the Debtor in the first place, there can be no judgment against them, so no joint and several liability.  Thus, while the contention that the corporate veil should be pierced as to those Defendants is based on state law, such contention does not exist independent of the dischargeability action.  Because I conclude that all claims and counterclaims in this case arise out of the same series of transactions, particularly the 2007 and 2008 AMAs, they are both statutorily and constitutionally core.

25

### *The Court Has Authority to Decide Statutorily*
### *or Constitutionally Noncore Matters With Consent of the Parties,*
### *and Such Consent Was Given Here*

Regardless, I hold that even if this is a noncore proceeding, for statutory or constitutional reasons, all parties have consented, expressly or impliedly, to entry of final judgment by this Court, and such consent is constitutionally valid. In *Stern*, the creditor had argued that the defamation action upon which his proof of claim was based was a personal injury tort claim which could only be tried in the district court.[68] That issue was raised for the first time on appeal. The Supreme Court held that if the creditor believed the bankruptcy court did not have the authority to decide his claim for defamation, then he should have said so, and said so "promptly."[69]

As the current case demonstrates, cases do not always fit neatly into one of the three categories described in *Stern* and *Arkison*. For that reason, and in order to avoid sandbagging by a party for whom trial does not go well, the bankruptcy rules require a complaint or counterclaim to "contain a statement that the proceeding is core or noncore, and, if noncore, that the pleader does or does not consent to entry of final orders or judgment by the bankruptcy judge."[70]

In his Complaint, Wilson alleged that this is a core proceeding and stated that "[t]his Court has jurisdiction under 28 U.S.C. § 157(c)(1) with respect to Tamar Walker and Precious Princess Productions, LLC if not a core proceeding

---

[68] 28 U.S.C. § 157(b)(5).

[69] 131 S. Ct. at 2594, 2608.

[70] Fed. R. Bankr. P. 7008(a).

because all actions are related to this bankruptcy proceeding and determine potential assets of the estate."[71]  Tellingly, despite the requirement of Rule 7008, the Complaint did not state whether Wilson consents to final judgment in this court if the proceeding were determined to be non-core.  Only after trial, when this Court asked for the parties' positions on the court's authority in light of the recent *Arkison* decision, did Wilson state that he does not consent to this Court's entry of final judgment as to noncore matters.[72]  That assertion, coming some eighteen months after the Complaint was filed, is not "prompt."  I hold that by failing to assert any position at the earliest opportunity, Wilson waived his right to object, and consented to entry of final judgment here.  And, while the Supreme Court has not specifically decided whether bankruptcy judges may enter final judgment in noncore and *Stern* matters with consent,[73] the Court has held that "Article III's guarantee of an impartial and independent federal adjudication is subject to waiver, just as are other personal constitutional rights that dictate the procedures by which civil and criminal matters must be tried."[74]  Most pertinently, the Court has held that a consensual referral to a magistrate judge – whose authority likewise is

---

[71]  Complaint, ¶¶ 5 and 6.

[72]  Doc. No. 148.

[73]  *See Wellness Intern. Network, Ltd. v. Sharif*, 727 F.3d 751 (7th Cir. 2013), *cert. granted in part*, ___ S. Ct. ____, 2014 WL 497634 (July 1, 2014) (granting certiorari on whether the a bankruptcy court has constitutional authority to enter a final order deciding whether property is property of the bankruptcy estate under § 541, even where there is a presence of a subsidiary state property law issue and whether Article III permits the exercise of judicial power of the United States by the bankruptcy courts on the basis of litigant consent, and if so, whether implied consent is sufficient).

[74]  *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 848, 106 S. Ct. 3245, 3255, 92 L.Ed.2d 675 (1986).

grounded in Article I – suffices to give that judge authority to enter final judgment.[75]

I find, therefore, that even if the parties' consent to final judgment was required, the parties did so consent, and such consent serves to give this Court authority to enter final judgment in any event.

## NONDISCHARGEABILITY UNDER
## 11 U.S.C. § 523(a)(2), (a)(4), and (a)(6)

Wilson asserts that the Debtor has breached both the 2007 and 2008 AMAs, and that any resulting debt should be excepted from discharge pursuant to § 523(a)(2), (a)(4), and (a)(6) of the Bankruptcy Code.[76]  The threshold question as to the § 523 dischargeability claims, however, is whether the Debtor owes Wilson a debt at all.

Each of the three AMAs provided that Virginia law shall control.  Under Virginia law:

> As a general principle, one who accepts a written agreement or contract is presumed to know and assent to its contents.  In addition, it is hornbook law that one who signs a written contract will normally be bound by its terms and that ignorance . . . of the terms will not ordinarily affect the liability of such person under the contract.[77]

---

[75] *See Roell v. Withrow*, 538 U.S. 580, 123 S. Ct. 1696, 155 L.Ed.2d 775 (2003) (holding that, under 28 U.S.C. § 636(c)(1), a consensual referral gives a magistrate judge full authority over dispositive motions, conduct of trial, and entry of final judgment, all without district court review, and that consent to proceedings before a magistrate judge can be inferred from a party's conduct during litigation).  *See also Pacemaker Diagnostic Clinic of America, Inc. v. Instromedix, Inc.*, 725 F.2d 537 (9th Cir. 1984) (*en banc*) (Kennedy, J.) (holding that the section of the Federal Magistrate Act (28 U.S.C. § 363(c)) which allows magistrates to conduct civil trials and enter final judgment with the consent of all parties does not violated the Constitution).

[76] Complaint, ¶ 11.

[77] *Reel v. Anderson Fin. Servs., LLC*, No. 5:07CV00080, 2008 WL 53222 at *5 (W.D. Va. Jan. 2, 2008) (not reported) (citation and internal bracket marks omitted).

Virginia law, however, permits a court to void a contract if it is unconscionable:

> In Virginia, a contract is unconscionable if it is one that no man in his senses and not under a delusion would make, on the one hand, and that no fair man would accept on the other.  The substantive terms of the contract must be so grossly inequitable that it shocks the conscience.  The party asserting unconscionability of a contract has the burden of proving that the contract is unconscionable by clear and convincing evidence.  Moreover, whether a contract is unconscionable is a question of law for a court to decide.[78]

Courts cannot relieve one of the consequences of a contract merely because it was unwise or rewrite a contract simply because the contact may appear to reach an unfair result.[79]

"A court may well find a substantive abuse in the form of harshness, evident either in an overall imbalance of the whole contract or in a particularly unreasonable provision that has been included in an agreement without the employment of any procedural abuse in its formation."[80]  "Under this rationale, oppression includes those provisions, however obtained, which result in oppressive effects."[81]  As between substantive and procedural unconcionability, courts often employ a balancing approach:  the greater the harshness or unreasonableness of the substantive terms, the less important the regularity of the process of contract formation that gave rise to the term becomes, and vice versa.[82]

---

[78] *Fransmart, LLC v. Freshii Dev., LLC*, 768 F.Supp2d. 851, 870-71 (E.D. Va. 2011) (citations, internal quotation marks, and brackets omitted).  *See also Reel v. Anderson Fin. Servs.*, 2008 WL 53222 at *6 n. 7 (W.D. Va. Jan 2, 2008).

[79] *Id.* at 871.

[80] 8 *Williston on Contracts* § 18:14 (4th ed.) (footnotes omitted).

[81] *Id.* (footnote omitted).

[82] *Id.* (footnotes omitted).  *See also* Thomas D. Selz, Melvin Simensky, Patricia Acton & Robert Lind, 2 *Entertainment Law 3d:  Legal Concepts and Business Practices* § 9:140

"A court may *void* a contract on the grounds that it is unconscionable if the inequality is so gross as to shock the conscience."[83]

Although Wilson was the more sophisticated of the two parties, and the Debtor testified that Wilson often asked him to sign the documents without giving him the opportunity to read them, any procedural imbalance in the execution of any of the AMAs is significantly overshadowed by the substantive provisions which, I find, are exceptionally harsh and oppressive against the Debtor. That would be so even if, as Wilson contends, the Debtor was fully informed of the provisions of the 2007 and 2008 AMAs.

First, the term: The 2007 AMA extended the original term of three years with a four one-year options to twenty years with Wilson having four exclusive two-year renewal options. Although Wilson now says the insertion of "25" into the 2008 AMA was a typographical error, the 2008 AMA appears to have extended the term even further to 25 years from signing, with Wilson having the exclusive right to exercise options for up to an additional eight years, for a total of 33 years. In any event, neither the evidence nor the law supports the long terms under either the 2007 AMA or the 2008 AMA.

First, Mickey Gilley testified about the term of a typical management agreement such as the AMAs here. Gilley has been in the entertainment industry since 1957, and in short, has extensive experience as a country music performer,[84] a country music nightclub owner, and, for about 24 years, a country music theater

---

(describing a sliding scale for unconscionability in talent contracts in California, under which "the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required, and vise versa.").

[83] *Reel v. Anderson Fin. Servs.*, 2008 WL 53222 at *6 n. 7 (citation and internal brackets omitted; emphasis added).

[84] Mickey Gilley testified he has 39 top-ten and 17 number-one records recorded in the 1970s and 1980s.

owner in Branson.  He testified that a typical management agreement such as the one between Wilson and the Debtor would be three to five years.  Renewal options are usually for the same term as the original term.  He said he once had a ten-year agreement with his manager, but that unusually-long term was because he and his manager also co-owned a nightclub in Texas.  He testified he had never seen a management agreement with a term of twenty years, and, in his opinion, such a term would be "unreasonable."  A 25-year term would be "very unreasonable," he said.  Indeed, although Virginia does not have a statutory maximum duration for personal services contracts such as the AMAs here, California has a seven-year statutory maximum,[85] which is consistent with Gilley's testimony that a three- to five-year term is typical.  This is also consistent with the original 2005 AMA, drafted by an entertainment attorney, which had a duration of three years with four one-year options to renew.

Wilson attempted to justify the term of up to 33 years by arguing that it takes longer to develop the career of an impressionist (as opposed to a typical singer/recording artist) and that, once developed, an impressionist's career tends to last longer.  But Wilson had no experience managing impressionists, and little experience managing other performers.  He testified that the first act he managed, named "Heavy Country," was in the D.C. area in 1992 or 1993.  He then managed the lead singer of that group briefly, whose last name was Wompler.  Wilson

---

[85]  Cal. Lab. Code § 2855(a) ("Except as otherwise provided in subdivision (b), a contract to render personal service . . . may not be enforced against the employee beyond seven years from the commencement of service under it.").  *See also* Thomas D. Selz, Melvin Simensky, Patricia Acton & Robert Lind, 2 *Entertainment Law 3d: Legal Concepts and Business Practices* § 9:142 at 1 n. 2 ("This is a major reason why the compensation of talent working on successful television shows increases so dramatically when the show has aired longer than seven years. Television production companies must renegotiate the talent contracts, providing the talent with the bargaining power to obtain sizeable increases in compensation.") (citing Josef Adalian, *Staying "Friends,"* Daily Variety, Feb. 12, 2002, at 1).

thought his first name might have been "Harry," but wasn't sure. Later, he managed another singer who he remembered being named "Skip." That management experience over a ten-year period prior to meeting the Debtor hardly justified a contract of up to 33 years.

Finally, I find it noteworthy that, when the parties signed the 2007 AMA, Wilson had the Debtor initial the paragraph which extended the term from three years to twenty years. None of the other paragraphs were initialed. Wilson acknowledged at trial that he requested the Debtor to initial that paragraph because twenty-year period looked "awkward" and he wanted to be clear that they were not creating a short-term project. So, even Wilson realized at the time that the 20-year term was, at the very least, unusual.

Second, and greatly exacerbating the unreasonable length of the contract, the Debtor had no practical ability under either the 2007 AMA or 2008 AMA to terminate Wilson for any reason, including incompetence or inability to perform. More specifically, Wilson added the following language to the 2007 AMA, which was not included in the original version drafted by an attorney: "It is understood by ARTIST that MANAGER cannot be replaced or fired for any reason or circumstances during this twenty (20) years [sic] Agreement, exception [sic] specified in paragraph (12)."[86] Paragraph 12 provided for a cure period for any alleged breach and required arbitration in Virginia in the event of an uncured breach. The 2008 AMA retained these provisions. However, the AMAs did not really require Wilson to do anything, except give "advice and counsel," which, by the summer of 2008, the Debtor was alleging Wilson was in breach of.

Recall, by the summer of 2008, the Debtor had come to the conclusion that Wilson was not adequately representing him, and hired an attorney who tried to

---

[86] Exhibit 10 at ¶ 10.

terminate the contract, but Wilson took the position that he could not do so.  And, the evidence was that, by the summer of 2008, it was clear that Wilson's representation was, in fact, incompetent.

More specifically, prior to 2008, the Debtor was performing at the Gilley Theater and was being paid under a five-year contract there.  He was a new act, but Gilley testified that the Debtor was doing quite well for a new act and believed his talent would develop a following in Branson.  However, Gilley testified, it takes up to three years for an act to start making money.  In any event, it was just as the Debtor was starting to gain momentum in Branson that Wilson decided to walk out on the contract with Gilley and go to Tennessee – without a signed contract in Tennessee, without an actual venue in Tennessee, without the promised money being placed in escrow, and without doing any due diligence as to Deason and Bowman's wherewithal, either professionally or financially, to fulfill the promises they had made.  Indeed, in responding to a question at trial about why he did not list anything relating to his relationship with the Debtor on his own bankruptcy schedules, including Question 17 concerning any anticipated increase or decrease in income, Wilson responded that they were getting ready at that time to move to Pigeon Forge and that that deal was "very speculative" at the time.

Further, after the Tennessee deal failed miserably, the Debtor testified, and I find, Wilson torpedoed the potential deal with Don King by his behavior at the meetings and by demanding large advances not provided by the contract.  And, Gilley told the Debtor he would have him back to the Gilley Theater, but only without Wilson.   It was at that point that the Debtor attempted to terminate the 2008 AMA, but Wilson took the position that the Debtor could not get out of it for any reason.  In effect, the Debtor was going to be stuck with Wilson until at least

33

the year 2036 (and perhaps 2041) – essentially his entire career[87] – regardless of how competently, or incompetently, Wilson was performing his duties.

"[C]ontracts in the entertainment industry generally include a termination provision that permits one or both of the parties to terminate the agreement under specified situations."[88]   As a practical matter, the 2007 and 2008 AMAs did not. And, when the Debtor attempted to terminate, Wilson refused and demanded that the matter go to arbitration.  When they got to arbitration, Wilson discovered that it was prohibitively expensive to seek redress there so, without either side paying his share, the arbitration proceeding died.  So Wilson's position is that disputes can only be decided in arbitration, but that he is not willing to pay his share of the freight for doing so.  The result is that the Debtor would be stuck for the duration of the term.

Third, Wilson's level of compensation under the 2008 AMA was excessive. Under each of the AMAs, Wilson was to act as the Debtor's "personal manager, advisor and counselor."[89]   The AMAs expressly state that Wilson is *not* an employment agent, theatrical agent, or licensed artist manager, and that Wilson was not promising to procure, nor was he obligated to produce or attempt to produce, any employment or engagements for the Debtor.[90]

A treatise on the law of contracts in the entertainment industry describes the role of a personal manager as follows:

---

[87]  As stated above, when the parties met in 2002, Wilson was approximately 45 years old, and Walker was 26.  Thus, by the time the 2008 AMA was signed, Wilson was approximately 51 and Walker was approximately 32.  If Wilson asserted a 25-year term and exercised all of the renewal options under the 2008 AMA, Walker would be 84 and Walker would be 65 years old before Walker would be free of Wilson.

[88]  Thomas D. Selz, Melvin Simensky, Patricia Acton & Robert Lind, 2 *Entertainment Law 3d:  Legal Concepts and Business Practices* § 9:125.

[89]  Exhibit 7 at 1; Exhibit 10 at 1; Exhibit 12 at 1.

[90]  Exhibit 7 at ¶ 1.g; Exhibit 10 at ¶ 1.G; Exhibit 12 at ¶ 1.H.

> The primary roles of a personal manager in the entertainment industry
> include counseling, advising, and supervising the development of an
> artist's career development.  The role of the personal manager
> differs from the role of the agent in that an agent is licensed by the state to
> perform a function that is predominantly business related, to procure
> employment for an artist.  The manager's duties, however, include
> both business and personal matters.  By organizing an artist's day-to-
> day personal matters, a manager frees the artist to concentrate more on
> creative matters. . . .[91]

Wilson's listed duties under each of the three AMAs are consistent with this description of a personal manager.

The 2008 AMA provided that Wilson's commission was 50% of the Debtor's "gross compensation" from all sources.  Further, the Debtor was solely responsible for "all expenses that may arise in connection with [the Debtor's] activities in the entertainment industry, including, but not limited to, the cost of material, equipment, facilities, transportation, lodging and living expenses, costume, make-up, accounting and legal fees, and [Wilson] shall not have liability what so ever [sic] in such connection."[92]  Under these provisions, then, the Debtor could, in theory, end up with no compensation at all after payment of Wilson's share from the gross receipts and paying all the expenses from his own share.  The 2007 AMA had similarly made the Debtor responsible for all expenses.  Thus, while Wilson argues he was operating as a sole proprietor, the contract provides that his employee – the Debtor – was responsible for the sole proprietorship's

---

[91] Thomas D. Selz, Melvin Simensky, Patricia Acton & Robert Lind, 2 *Entertainment Law 3d:  Legal Concepts and Business Practices* § 8:7 at 1 (footnotes omitted).  Further: "Personal managers primarily advise, counsel, direct, and coordinate the development of the artist's career.  They advise in both business and personal matters, frequently lend money to young artists and serve as spokespersons for the artists.  A personal manager attempts to make the artist as marketable and attractive to talent buyers as possible.") *Id*. at 1, n.1 (citations and internal quotation marks omitted).

[92] Exhibit 12 at ¶ 7.

expenses.   To the extent Wilson needed to pay those expenses himself notwithstanding the contract, because the Debtor couldn't do so, that is further evidence of the unconscionability of the contract terms.

In stark contrast to the 50% commission in the 2008 AMA, "[t]*he commission for a personal manager traditionally ranges from 15-20%.*"[93]  This is reflected in the original 2005 AMA, written by an entertainment attorney, which provided for a 15% commission.

In addition, Mickey Gilley described the role of a personal manager similar to that described by the treatise above, and testified that the typical fee under a management agreement would be 10-25%.  He did testify that he and his original manager had a 50/50 deal at one point, but, again, that was only because they also owned a nightclub together.  Indeed, it has been said that "[t]he famous exception [to the traditional 15-20% commission for a personal manager] was Colonel Tom Parker, the manager of Elvis Presley, who received a commission of 50%."[94]  Don King's deal was for 50%, but only on acts that Don King actually booked for the Debtor, and this deal was negotiated by Wilson on the Debtor's behalf.  Plus, even during the two-day meeting in Florida, Don King was making initial connections on the Debtor's behalf with the likes of Donald Trump and Michael Jackson.  Even if rare exceptions such as Colonel Parker and Don King are able to command commissions in the 50% range, Wilson's record and experience simply do not support a commission at that level.

Wilson testified that he increased the percentage from 25% under the 2007 AMA to 50% under the 2008 AMA, in part because he was now agreeing to

---

[93] 2 *Entertainment Law 3d* § 8:7 at 1 (emphasis added).

[94] *Id.* at 1, n.5.  A "business manager," typically an accountant, is primarily responsible for the financial needs of the talent and "traditionally receives a 5% commission on all of the compensation received by the talent." 1 *Entertainment Law 3d.* § 8:10.

represent the Debtor to the exclusion of other artists and that he was incurring additional risk as a result. However, the traditional 15-20% already takes much of that risk into account.[95] And, Wilson failed to prove that any other performers at that time were desirous of Wilson's representation or that he had turned down other management work as a result of his representation of the Debtor. Moreover, as stated, it is now apparent that Wilson's management of the Debtor's career was ineffectual up to that point, regardless of whether Wilson was representing other artists. The unusual level of compensation was, I find, further evidence of the unconscionability of the 2008 AMA.

Finally, as discussed above, the original 2005 AMA provided, in relevant part:

> If MANAGER is not personally available to render the services of MANAGER as described herein (except for limited periods not to exceed ninety (90) days because of illness), then ARTIST shall have the option to terminate this Agreement upon thirty (30) days written notice to MANAGER.[96]

The corresponding provision in the 2007 AMA was amended to provide, in relevant part:

> If MANAGER is not personally available to render the services of MANAGER as described herein (except for limited periods not to exceed one hundred eighty (180) days because of illness), MANAGER will have the right to secure temporary replacement management for the remaining period of this Agreement.[97]

---

[95] 1 *Entertainment Law 3d.* § 8.7 at 1, n.5 ("Due to their greater degree of involvement with the artist and the risk they take in representing artists without established track records, personal managers typically have a smaller client base than do talent agents and charge higher commissions than talent agents.").

[96] Exhibit 7 at ¶ 16.

[97] Exhibit 10 at ¶ 16.

The 2008 AMA went even further:

> If MANAGER is not personally available to render the services of
> MANAGER as described herein (except for limited periods not to
> exceed one hundred eighty (180) days because of illness),
> MANAGER will have the right to secure temporary replacement
> management for the remaining period of this Agreement.  In the event
> MANAGER pass's [sic] away, ARTIST will allow MANAGER'S
> benefactor the right to hire at benefactor['s] cost, a replacement
> MANAGER (ACCEPTIBLE [sic] TO ARTIST) for the remainder
> period of contract with no options.  Payments will be paid at [the]
> same existing rate to benefactor and will be paid monthly by ARTIST
> or new MANAGER less MANAGER[']S prior arranged fee from
> benefactor with a detailed account of monthly receipts.[98]

In essence, these changes permitted Wilson to hire a replacement for the *remainder
of the term* if he were unable to perform, no matter how long the remainder was,
instead of allowing the Debtor to terminate.  And, upon his death, Wilson's
"benefactor" is empowered to choose a replacement, albeit with the Debtor's
approval – but at the same rate of compensation.  Regardless, though, it appears
that Wilson's "benefactor" would be entitled to compensation for the balance of
the term, regardless of whether the benefactor was able to procure an acceptable
replacement manager.

I find, based on the foregoing, that the Debtor has proven by clear and
convincing evidence that both the 2007 and 2008 AMAs are such that no person in
his senses and not under a delusion would make, on the one hand, and that no fair
person would accept on the other.  The substantive terms of these contracts are,
indeed, so grossly inequitable as to shock the conscience.  They are, therefore, void
and unenforceable.

---

[98]  Exhibit 12 at ¶ 16.

Moreover, I find that Wilson lost no investment he may have made pursuant to either the 2007 or 2008 AMA.  As shown, all expenses and loans for 2007 were paid, and no W&W debts arising from that year, or any years since he had begun managing the Debtor, were listed in Wilson's bankruptcy schedules.  Nor is there any evidence that Wilson lost any investment in the Tennessee venture in 2008.  While SMEC did not fully and timely comply with its obligations under its contract with W&W, Wilson did not have significant unpaid expenses in the period between his bankruptcy filing on March 6 and the sudden termination by SMEC on or about July 19, 2008.  The 2008 AMA, as stated, provides that Wilson is entitled to recover all expenses he incurs before the Debtor becomes entitled to his 50% share.  Thus, when Wilson received $6,000 on July 15, 2008,[99] he testified that the Debtor would have received a similar amount.  Indeed, the evidence shows that during the years 2007 and 2008, Wilson and the Debtor each received approximately 50% of funds paid out by W&W, with Wilson receiving $43,647.86,[100] and the Debtor receiving $43,755.[101]  While not necessarily relevant on the issue of whether the 2007 and 2008 AMA's were unconscionable, it is worth noting that Wilson was out little actual money, if any, in the period after his bankruptcy filing.  And, as stated, recovery of any funds he invested prior to his own bankruptcy would have been available to his creditors, not him.

Having found that the 2007 and 2008 AMAs, upon which the claim of nondischargeability is based, are void, I hold that the Debtor owes Wilson no debt which can be declared nondischargeable under any provision of § 523 of the Bankruptcy Code.

---

[99] *See* Exhibit 96 at 689.

[100] Trial Aid 15.

[101] Trial Aid 1.

## **DENIAL OF DISCHARGE PURSUANT TO 11 U.S.C. § 727**

Wilson asserts that the Debtor's discharge should be denied generally pursuant to § 727(a)(2), (a)(3), (a)(4), and (a)(5) of the Bankruptcy Code.  Section 727(a) provides, in relevant part:

(a) The court shall grant the debtor a discharge, unless—

\* \* \*

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed –

(A) property of the debtor, within one year before the date of the filing of the petition; or

(B) property of the estate, after the date of the filing of the petition;

(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;

(4) the debtor knowingly and fraudulently, in or in connection with the case –

(A) made a false oath or account;

(B) presented or used a false claim;

40

>   (C) gave, offered, received, or attempted to obtain
>   money, property, or advantage, or a promise of money,
>   property, or advantage, for acting or forbearing to act; or
>
>   (D) withheld from an officer of the estate entitled to
>   possession under this title, any recorded information,
>   including books, documents, records, and papers, relating
>   to the debtor's property or financial affairs;  [or]
>
>   (5) the debtor has failed to explain satisfactorily, before
>   determination of denial of discharge under this paragraph, any
>   loss of assets or deficiency of assets to meet the debtor's
>   liabilities. . . .[102]

Denying a debtor a discharge is a harsh penalty.[103]  Consequently, § 727 is strictly construed in favor of the debtor.[104]  Nevertheless, a discharge in bankruptcy and the associated fresh start are privileges, not fundamental rights.[105]  The burden of proof is on the objecting party to prove each element of a § 727 action by a preponderance of the evidence.[106]

Wilson's argument under § 727 focuses on the creation of Precious Princess Productions and Unchained Productions.  As discussed above, Tamar Walker created Precious Princess in August 2009, after it became evident that Wilson was not going to give up his efforts to collect half of all of the Debtor's gross income. In 2012, she created Unchained Productions as a successor to Precious Princess. Since August 2009, any income the Debtor has earned from performances and sales of CDs and DVDs has been paid to Precious Princess, and now Unchained

---

[102]  11 U.S.C. § 727(a).

[103]  *Allred v. Vilhauer* (*In re Vilhauer*), 458 B.R. 511, 514 (B.A.P. 8th Cir. 2011).

[104]  *Id.*

[105]  *Bauer v. Iannacone* (*In re Bauer*), 298 B.R. 353, 357 (B.A.P. 8th Cir. 2003).

[106]  *Floret v. Sendecky* (*In re Sendecky*), 283 B.R. 760, 763 (B.A.P. 8th Cir. 2002).

Productions.  Unchained Productions, in turn, pays the Debtor $50 per show, and pays for all the family's living expenses.

### *Section 727(a)(2)*

As to § 727(a)(2), the elements of proof under paragraphs (A) and (B) are "virtually the same, differing only in the requisite timing of the debtor's acts and the nature of the property involved."[107]

> To prevail under either subsection 727(a)(2)(A) or (B), [Wilson] must prove by a preponderance of the evidence:  (1) the act serving as the basis for the claim took place within one year before the petition date (subsection A) or after the petition for relief (subsection B); (2) the act was that of Debtor; (3) the act amounted to a transfer, removal, destruction, mutilation or concealment of property of the bankruptcy estate; and (4) the act was done with an intent to hinder, delay, or defraud a creditor or the trustee.[108]

I do find that the Walkers' method of funneling income through Precious Princess and Unchained Productions were transfers of funds which occurred both within one year before the petition date and after the petition date.  I further find that they created these entities in direct response to Wilson's efforts to prevent the Debtor from getting any work without Wilson's participation.  However, as discussed above, I hold that Wilson is owed nothing and is, therefore, not a creditor.  Other than Wilson, the Debtor lists debts totaling $52,722.  I further find that Wilson did not prove that the Debtor or Tamar transferred the Debtor's income to Precious Princess or Unchained Productions with the intent of defrauding anyone else.  Therefore, Wilson has failed to prove the fourth element for denial of discharge under § 727(a)(2).

---

[107] *Kaler v. Hentz*, (*In re Hentz*), ___ B.R. ____ 2013, WL 1197616 at *8 (Bankr. D. N.D. March 24, 2013) (slip copy).

[108] *Id.* (citations omitted).

### *Section 727(a)(3)*

"To prevail under § 727(a)(3), a party seeking the denial of the debtor's discharge must establish that a debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case. . . ."[109]  "Once that party has shown that the debtor's records are inadequate, the burden of production shifts to the debtor to offer a justification for his record keeping (or lack thereof); however, the objecting party bears the ultimate burden of proof with respect to all elements of this claim."[110]

This case presents a somewhat unusual situation with regard to the record-keeping.  The Debtor is an individual.  However, everything he earns as a self-employed entertainer is run through his wife's LLC.  All of Tamar Walker's income for her work with Angels of Country Music is also run through Unchained Productions.  As stated, Unchained Productions pays all of the Walker family's living expenses, including the Debtor's child support.  Much time was spent at trial trying to hash out the financial records of Precious Princess and Unchained Productions, which consisted primarily of checking account records, tax returns, and pieces of paper concerning sales of merchandise.  Suffice it to say that the records were difficult to sort through.  Wilson therefore met his burden of proving that the records were inadequate.  Thus, the burden shifts to the Debtor to show that the inadequate record keeping was justified under the circumstances.

---

[109] *McDermott v. Swanson* (*In re Swanson*), 476 B.R. 236, 240 (B.A.P. 8th Cir. 2012) (citation omitted).

[110] *Id.*

Although the Bankruptcy Code does not require an impeccable system of bookkeeping, the records must sufficiently identify the transactions so that intelligent inquiry can be made of them. Even if poorly organized, there must be a reasonably sufficient basis upon which to ascertain the debtor's financial condition. Various factors may be utilized to determine whether the records are inadequate for purposes of applying § 727(a)(3) and include: the debtor's education, the debtor's business experience, the sophistication of the debtor, the volume of the debtor's business, the complexity of the debtor's business, the debtor's personal financial structure, and any other circumstances that should be considered in the interest of justice.[111]

The Debtor, based on my observation of him, has limited formal education, and no experience or skills at keeping books. He may be a talented performer, but he is far from a sophisticated businessman. Indeed, as discussed above, the very reason performers such as the Debtor hire personal and business managers to handle the business duties is so that the artist can focus on what he is good at: creative matters. When the Debtor was managed by Wilson, it was Wilson's responsibility to keep the books. When the Debtor was managed by Precious Princess and Unchained Productions, the record-keeping duty fell to Tamar.

Although Tamar has more experience at bookkeeping than her husband does, she is not particularly sophisticated in business matters, either. Further, the Walkers testified that Tamar became pregnant with twins in mid-September 2009, and that she had complications with the pregnancy. She lost one of the twins very soon after becoming pregnant, and then lost the other twin in October. Tamar testified she had to have surgery as a result of that pregnancy. She then became pregnant again in March 2010, again with twins. Tamar testified that, with this pregnancy, she developed a complication she referred to as "twin-to-twin

---

[111] *United States Trustee v. Kouangvan* (*In re Kouangvan*), 2012 WL 2931182 at *3 (Bankr. S.D. Iowa July 18, 2012) (slip copy) (citations, internal quotation marks, and brackets omitted).

44

transfusion syndrome," whereby one of the babies gives the other all of the in-vitro nutrients, resulting in one of the babies being too small.  According to the Debtor, Tamar was on bed-rest during much of this time period.  She was then transferred to a hospital in Texas, and had a Caesarian section in July 2010.  One of the babies died in October 2010.  Tamar testified that, while the Debtor returned to Branson to perform at the God & Country Theater, she stayed in Texas with the surviving baby, who remained in the hospital until December that year.  Tamar then lived with her parents in Oklahoma for a period of time, and did not return to Branson until April 2011 for the spring season.  Meanwhile, the Walkers' child apparently continued to have some health problems because Tamar also testified that, while they were in Cancun for a series of performances, she had to return to the States with her son so he could have another surgery.  Tamar testified that she was trying to keep the books during this time period, even when she was in Texas, but she admitted was not doing a very good job at that time.

Given her lack of business sophistication and the nature of their business, and particularly considering the circumstances relating to the children, I find that Tamar's failure to keep detailed books and records during the 2009 to 2012 time period was both understandable and justifiable.  Although it was not easy to put the information together at trial, the evidence was sufficient to reasonably ascertain the Walkers' financial condition during that time period.  Most pertinently, the evidence showed that, after payment of expenses needed for their performances, the Walkers did not have sufficient funds remaining from their monthly income to pay reasonable living expenses.  For example, the 2009 joint tax return of the Walkers shows gross income of $5,707, less expenses of $5,520, for a net of $187. The return for Precious Princess shows gross income of $18,570, cost of goods

sold (such as DVDs) of $10,497, expenses of $7,913, and a net profit of $160.[112] For obvious reasons, the Walkers testified they had to borrow money from her family from time to time to pay their living expenses. Thus, the Debtor has maintained records sufficient to ascertain that they had no income available after expenses.

I find that the Walkers' failure to keep better records was justified under the circumstances of the case, and that Wilson has not met his burden for denial of the discharge under § 727(a)(3).

### *Section 727(a)(4)*

Section 727(a)(4) provides that the court is to deny a debtor a discharge if the debtor "knowingly and fraudulently, in connection with the case . . . made a false oath or account." Wilson asserts that the Debtor's schedules are inaccurate because they only show $50 per month in income, even though he earns significantly more from his actual performances and sales of merchandise.

The Debtor's schedules list $50 per month in income attributed to himself. Tamar's column states that she is the owner and operator of Precious Princess Productions and that she earns $2,013.42 per month. Schedule I also discloses that "Debtor performs shows in Branson, Missour[i] weekly. He receives $50.00 per show, averaging 2 shows per week this season; money is paid by theater to non-filing spouse's business Precious Princess Productions, LLC."

As stated, while the Walkers structured their finances so as to avoid Wilson, the Debtor did disclose that arrangement on his schedules. In addition, "in order for a false statement, made in connection with a case, to bar a debtor's discharge, the statement must be both material and made with intent."[113] I find that, to the

---

[112] Exhibit 124.

[113] *In re Sendecky*, 283 B.R. at 765.

46

extent the schedules are inaccurate in any other way, the Debtor did not intend to deceive anyone, and such misstatements are not material.  Wilson has, therefore, failed to prove that the Debtor's discharge should be denied under § 727(a)(4).

## THE DEBTOR'S COUNTERCLAIM AGAINST WILSON

After the quote appeared in the newspaper stating that Wilson was the cause of the Debtor being fired from the Pigeon Forge deal,[114] Wilson sued Deason and Bowman on September 18, 2008, for, *inter alia*, breach of contract and defamation.[115]  He alleged in his lawsuit that Deason was "a convicted felon of various federal and international fraud-related offenses."[116]  A month later, on October 18, 2008, although Wilson had been represented by counsel in that litigation on a contingency basis, Wilson settled the lawsuit on his own, without advising his attorneys.[117]

As part of that October 18, 2008, transaction, Wilson, Deason, and Bowman signed two separate documents.  One of them, entitled "Mutual Release," provided that Wilson would dismiss the pending lawsuit in exchange for Deason and Bowman's payment of $3,000 to him.[118]  The second, entitled "Agreement," provided that Deason and Bowman would give Wilson four items:  (i) $7,000 in cash; (ii) a collection of guitars signed by various musicians which had been displayed in the lobby of the venue where the Debtor performed in Pigeon Forge;

---

[114]  Exhibit 57.

[115]  Exhibit 19.

[116]  *Id.* at ¶ 2.

[117]  Because Wilson settled the case in contravention of the contingency fee agreement and thus, cut his lawyers out of the deal, Wilson's attorneys filed a lawsuit against him asserting an attorneys' lien on December 15, 2008.  *See* Defendants' Exhibit O.

[118]  Exhibit 23.

(iii) "[a] letter addressed to Joseph R. Wilson correcting the newspaper article and stating that it was Mike Walker, not Joseph R. Wilson[,] who was responsible for Mike Walker being fired"; and (iv) "a copy of the hand-written letter from Mike Walker."[119]   One can easily infer that the third and fourth items – in effect, cleaning up the allegations of misconduct on Wilson's part – were requested by Wilson at least in part in anticipation of litigation with the Debtor.

But the more disturbing aspect of this second document is the consideration Wilson agreed to provide Deason and Bowman in exchange.  Specifically, shortly before October 18, 2008, Wilson had made a secret tape recording of a phone conversation he had had with Eddie Rhines.  Although he declined to offer many specifics at trial, Wilson described the content of the tape as being vile and violent, and that Rhines was saying he was going to have Deason harmed.[120]   He also testified that that tape was something which Deason badly wanted:  Specifically, Deason intended to use the tape against Rhines in separate ongoing litigation between Deason and Rhines.[121]   In essence, Deason wanted to use the tape to extort Rhines into dismissing a multi-million lawsuit against him.[122]   Wilson testified that he initially demanded $100,000 from Deason for the tape, but ultimately settled for the $7,000, the guitars, and the retraction letter.

---

[119] Exhibit 24.

[120]  Also, in a pleading Wilson filed in the litigation with his contingency fee attorneys, Wilson said:  "In early October, 2008, I had a conversation with Rhines in which he asked me if I knew anyone he might be able to hire to cause bodily harm to Deason and others.  I recorded the conversation."  *Memorandum in Support of Defendant and Counter-Plaintiff's Opposition to Motion for Summary Judgment,* Defendant's Exhibit V at 2.

[121]  Apparently, Rhines, who was represented by the same contingency-fee attorneys representing Wilson, was suing Bowman and Deason for a significant amount of money based on, *inter alia,* the failed Pigeon Forge deal.

[122]  *See* Defendants' Exhibits O, P, Q, R, S, T, and U (litigation documents discussing the extortion tape and subsequent events).

Thus, in sum, the agreement provides that, in return for the $7,000, the guitars, and the letter retracting the newspaper quote, Wilson would "authenticate, in any manner required, the tape recording made of a phone conversation between Joseph R. Wilson and Eddie Rhines, the contents of which were made known to [Deason and Bowman]."[123]   Recall, this was despite the fact that Wilson had just described Deason a month earlier in his Complaint as a felon convicted of federal and international fraud charges.

In any event, the Debtor asserts in his counterclaim that Wilson's lawsuit against Deason and Bowman stemmed from the Pigeon Forge agreement between SMEC and W&W Enterprises, which, in turn, is tied to the 2008 AMA.  Thus, if the 2008 AMA is enforceable, then the Debtor asserts the money and guitars received under the settlement documents are all fruits of the 2008 AMA, to which the Debtor is entitled to half.  Wilson contends here, as he had in the litigation with the contingency-fee attorneys, that the second document was, in effect, a "sale" of the Rhines tape in exchange for the $7,000, guitars and the retraction and, therefore, was not related to the lawsuit over the contract between SMEC and W&W Enterprises.  It was a separate "transaction," he asserts.  Clearly, however, the settlement of the litigation between Wilson and Deason and Bowman was affected, and tied to, the Agreement concerning the extortion tape.  However, because I have concluded that the 2007 and 2008 AMAs are not enforceable, the Debtor's counterclaim based on either of those agreements must also fail.

---

[123]   Exhibit No. 24.  Wilson's contingency-fee attorney alleged in his own lawsuit against Wilson that, in effect, Wilson had also tried to extort $10,000 from Eddie Rhines for the tape.  Defendants' Exhibit O at ¶ 14.

## CONCLUSION

Accordingly, by separate Order, the Clerk of the Court will be directed to enter judgment as follows:

1.  In favor of the Defendants as to the Complaint;

2. In favor of the Plaintiff as to the counterclaim filed by certain of the Defendants;

3. Granting the Debtor a general discharge of all debts; and

4. Rejecting both the 2007 and 2008 Artist Management Agreements between Plaintiff and the Debtor.


Dated: 7/25/2014                    /s/ Arthur B. Federman
                                    Chief Bankruptcy Judge